Filed 12/1/22 P. v. Melara CA2/1
Opinion following transfer from Supreme Court

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>OSKAR ANTHONY MELARA,<br><br>Defendant and Appellant. | B289019<br><br>(Los Angeles County<br>Super. Ct. No. BA427561) |

APPEAL from a judgment of the Superior Court of Los Angeles County, David V. Herriford, Judge. Affirmed in part, reversed in part, and remanded with instructions.

Tanya Dellaca, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Zee Rodriguez and Paul S. Thies, Deputy Attorneys General, for Plaintiff and Respondent.

———————————

In 2017, a jury found defendant Oskar A. Melara guilty of second degree murder and found true the allegations that the murder was committed for the benefit of a criminal street gang under Penal Code[1] section 186.22, subdivision (b)(4) and that a principal personally and intentionally discharged a firearm, causing great bodily injury and death within the meaning of section 12022.53, subdivision (d).  The trial court sentenced Melara to 15 years to life for the second degree murder and 25 years to life for the section 12022.53, subdivision (d) enhancement.  The court also imposed certain fines, fees, and assessments.

In 2019, Melara raised several issues on appeal.  He argued the trial court erred in admitting certain gang expert testimony and denying his motion for new trial based on alleged jury misconduct and ineffective trial counsel.  He also argued his counsel was ineffective in failing to provide a mitigation report to the trial court before sentencing and that the trial court misunderstood the extent of its discretion in imposing a section 12022.53, subdivision (d) firearm enhancement.  Finally, Melara challenged the imposition of fines, fees, and assessments without holding an ability to pay hearing.

In February 2020, we affirmed the judgment on appeal and declined to remand the matter to allow the trial court to impose a lesser, uncharged firearm enhancement, concluding the trial court did not have discretion under the statute to do so.  Melara petitioned for review in the Supreme Court.

While that appeal was pending, the Supreme Court decided *People v. Tirado* (2022) 12 Cal.5th 688, 700 (*Tirado*), holding that

---

[1] Undesignated statutory citations are to the Penal Code.

a trial court had discretion to impose a lesser, uncharged firearm enhancement under section 12022.53. The Supreme Court granted Melara's petition for review and transferred the case to this court with directions to vacate our prior opinion and reconsider the enhancement issue in light of *Tirado*. (See Cal. Rules of Court, rule 8.528(d).) We vacated our prior opinion and the parties submitted supplemental briefs relating to *Tirado*.

We also granted Melara's request for supplemental briefing to address whether Melara is entitled to relief under Assembly Bill Nos. 124 (2021-2022 Reg. Sess.) (Stats. 2021, ch. 695) and 333 (2021-2022 Reg. Sess.) (Stats. 2021, ch. 699), effective January 1, 2022, and *People v. Valencia* (2021) 11 Cal.5th 818. In his supplemental briefs, Melara makes three arguments. First, he contends that under section 186.22, amended by Assembly Bill No. 333 (Assembly Bill 333), the matter should be remanded for retrial of the gang enhancement allegation and reconsideration of the sentence imposed for the firearm allegation predicated on the gang enhancement. Second, Melara contends that under section 1170, subdivision (b)(6), enacted under Assembly Bill No. 124 (Assembly Bill 124), the matter must be remanded for the trial court to consider whether to impose the lower term sentence for the gang enhancement. Third, Melara argues that pursuant to section 1109, enacted under Assembly Bill 333 and which provides for bifurcation of the gang allegation from the underlying offense, his second degree murder conviction must be vacated and the charge retried.

We reissue the portions of our prior opinion rejecting Melara's claims of error regarding the trial court's admission of gang expert testimony, denial of a new trial for alleged jury misconduct and ineffective assistance of counsel, lack of a

"mitigation report" and the imposition of fines, fees, and assessments without a hearing.

As for Melara's arguments in his supplemental briefs, there is no dispute that sections 186.22, 1170, subdivision (b)(6) and 12022.53 provide ameliorative relief and apply retroactively to nonfinal judgments. However, the parties (and appellate courts) disagree whether section 1109 applies retroactively. Following the guidance of *People v. Tran* (2022) 13 Cal.5th 1169 (*Tran*), we conclude no prejudice arose from trying Melara's underlying offense and gang enhancement together, and we need not decide the issue of section 1109's retroactivity.

Accordingly, we remand the matter to the trial court for retrial of the gang enhancement allegation under section 186.22 and, if found true, reconsideration of the trial court's sentence of the gang-firearm allegation pursuant to the principles articulated in section 12022.53, subdivision (h) as interpreted in *Tirado*, *supra*, 12 Cal.5th 688, as well as the principles articulated in section 1170, subdivision (b)(6). We otherwise affirm the judgment.

## PROCEDURAL BACKGROUND

The People charged Melara with the murder of Christopher Hernandez, a rival gang member. They further alleged the murder was committed for the benefit of a gang within the meaning of section 186.22, subdivision (b)(4), and that a principal personally used and intentionally discharged a firearm within the meaning of section 12022.53, subdivisions (b), (c), (d), and (e)(1). The trial court later dismissed the section 12022.53, subdivisions (b) and (c) allegations on the People's motion.

Jurors convicted Melara of second degree murder and found the crime was committed for the benefit of a gang under section

4

186.22, subdivision (b) and further, that a principal intentionally discharged a firearm within the meaning of section 12022.53, subdivision (d).

The trial court denied Melara's motion for a new trial based on alleged juror misconduct. It sentenced Melara to 15 years to life for the second degree murder, and 25 years to life for the section 12022.53, subdivision (d) enhancement, applicable pursuant to section 12022.53, subdivision (e)(1).[2] The court denied Melara's request to strike the enhancement in the interest of justice.

In addition, the court ordered that Melara pay a $40 court operations assessment (§ 1465.8, subd. (a)(1)) and a $30 criminal conviction assessment (Gov. Code, § 70373). The court also ordered that Melara pay a $300 restitution fine pursuant to section 1202.4, subdivision (b) and a separate $300 parole revocation fine, which it suspended unless parole is revoked (§ 1202.45). Finally, the court ordered Melara pay victim restitution in the amount of $12,420.50. Melara indicated there was "[n]o objection" to the $12,420.50 victim restitution. The record reflects he did not request or receive an ability to pay hearing prior to the imposition of the above-referenced restitution fine and assessments.

---

[2] Section 12022.53, subdivision (e)(1) states: "The enhancements provided in this section shall apply to any person who is a principal in the commission of an offense if both of the following are pled and proved: [¶] (A) The person violated subdivision (b) of [s]ection 186.22 [referring to felonies committed for the benefit of a criminal street gang]. [¶] (B) Any principal in the offense committed any act specified in subdivision (b), (c), or (d)."

Melara filed a timely appeal.

## FACTUAL BACKGROUND

On June 5, 2014, Hernandez, a Rebels 13 gang member, and his parents attended his sister's middle school graduation. Just before 11:00 a.m., the family was walking to a bus stop when Gustavo Luna, a La Mirada Locos gang member, shot Hernandez multiple times. Hernandez died of multiple gunshot wounds.

Shortly before the shooting, Hernandez chased Melara, who was riding a bicycle. Melara pushed Hernandez. During the encounter, Melara and Hernandez made signs symbolizing their respective gangs, and Hernandez removed his shirt revealing a Rebels 13 gang tattoo. Hernandez asked Melara to fight one on one.

A few minutes before Luna shot Hernandez, Melara called Luna.[3] Evidence from cell phone records indicated that Melara called Luna twice (at 10:51 a.m. and at 10:55 a.m.); the records did not reveal whether the two spoke or the content of any conversation.

Immediately before Luna shot Hernandez, Luna drove to Melara and stopped to talk with him. Luna then drove up to Hernandez, who was standing on the sidewalk, shot him, and drove away. Cell phone records suggest that Melara entered Luna's car shortly after the shooting because Luna's phone and the phone Melara was using traveled on the same path at the same speed to Oceanside, California.

---

[3] Melara used his girlfriend's phone to make these calls.

6

## A.     Surveillance Video

Video surveillance of the crime scene showed Hernandez and his family walking near a Del Taco restaurant on Sunset Boulevard.  It further showed Hernandez chasing Melara, who was riding a bicycle.  Hernandez then returned to his family, and they continued walking together.

Surveillance video depicts the following sequence of events: Melara is holding a phone to his head while riding his bicycle.  Shortly afterwards, a black car enters the Del Taco parking lot; Melara approaches the black car; and points towards Hernandez twice.  The black car pulls up to Hernandez and his family, and the driver shoots Hernandez.  It appears Melara is present when the driver shoots Hernandez, who falls backwards to the ground.

## B.     Gang Evidence

Officer Mark Austin testified for the prosecution.  Officer Austin opined that Luna was a "low-level" member of the La Mirada Locos gang.  Austin opined Melara was a "mid-level" member of the La Mirada Locos gang.

Officer Austin testified that a person is qualified to join a gang when that person "put[s] in work" or commits crimes "that benefit[ ] the gang."  Gangs, including the La Mirada Locos gang, claim territory and are willing to fight to protect their territory.  Violence is often the consequence of entering a rival gang's territory.  A gang member who disrespects a rival's territory may be killed.  Officer Austin observed cases in which a gang member would "set up a killing" to protect gang territory.  Officer Austin recalled five to seven such cases.  La Mirada Locos gang members use hand signs to threaten rival gang members.  The location where Luna shot Hernandez is in an area claimed by the La Mirada Locos gang.

The two gangs were rivals.  Photographs on Facebook showed Melara using gang signs.  He also wore attire commonly associated with the La Mirada Locos gang.  Photos also showed Melara with other La Mirada Locos gang members.  Police identified Melara as a La Mirada Locos gang member on field identification cards, and Melara admitted to officers that he had been arrested for gang-related crimes.  The prior offense involved a vandalism charge.

The La Mirada Locos gang shared a border with the Rebels 13 gang.  Officer Austin noted that Hernandez had a large tattoo stating "Rebels 13" on his chest.  Officer Austin testified that Hernandez had to "earn" that tattoo by committing crimes or raising money for his gang.  Displaying a tattoo to a rival gang member is an example of disrespecting the rival.  According to Officer Austin, a Rebels 13 gang member who enters another gang's territory is demonstrating "boldness."

The prosecutor asked Officer Austin the following hypothetical question:  "A gang member in Rebels 13 and his family are walking down a busy public street within a territory claimed by the La Mirada Locos street gang at approximately 10:45 to 10:50 in the morning.  As the Rebels 13 gang member is walking, he's pushed and taunted by a La Mirada Locos gang member who is riding a bicycle and an argument starts between the Rebels 13 and La Mirada Locos gang members.  The Rebels 13 gang member takes off his shirt . . . and chases the La Mirada Locos gang member who remains on his bicycle.  After being chased by the Rebels 13 gang member, the La Mirada Locos gang member on the bicycle makes a phone call.  A few minutes later a La Mirada Locos gang member or associate arrives and stops near the victim.  The La Mirada Locos gang member is the driver

8

and sole occupant in this vehicle.  There's a brief non-verbal communication between the La Mirada Locos gang member on the bicycle towards the driver and the Rebels 13 gang member. While the Rebel[s] 13 gang member is distracted by and looking at the La Mirada Locos gang member on the bicycle, the La Mirada Locos gang member in the vehicle drives up next to the Rebel[s] 13 gang member and immediately and without warning or any interaction shoots the Rebel[s] 13 gang member several times.  The La Mirada Locos gang member on the bicycle watches the shooting from a short distance away and then both the La Mirada Locos gang members together flee the area."

Officer Austin was asked how the crime benefits the La Mirada Locos gang, how it benefits the shooter, and how it benefits the gang member on the bike.  With respect to the hypothetical gang member on the bike, Officer Austin testified: "He is seen as someone that [*sic*] has had a confrontation and he's not going to back down.  And he obviously did [not] have the means to carry out the violence at the time, but he took immediate action and solved what he saw as the problem.  So even though he may not be the person shooting the gun, he's still attaining that level of respect from his fellow gang members and moving up [in the gang hierarchy].  And I think that is proof, just based on this hypothetical, the fact that he didn't call someone to get in a fight with him.  If that had happened, he wouldn't have ridden away and watched.  He would have gotten involved in the fight.  If he wanted to fight someone, he would have gotten out. The guy would have gotten out of the car and they both would have [fought the rival gang member].  Now they have two-on-one odds and have been involved in a physical altercation."  The trial

9

court overruled defense counsel's objection of "[s]peculation" made at the conclusion of the above summarized testimony.

Officer Austin continued his testimony as follows: "So my opinion, based on those facts, is that he [the hypothetical gang member on a bicycle] knew exactly what was about to happen and it happened. It was carried out. What he wanted was carried out. Now they both [the hypothetical shooter and the hypothetical bicycle rider] are rising in their own personal ranks within the gang." Defense counsel did not object to this testimony. During cross-examination, defense counsel asked whether Officer Austin assumed that the hypothetical shooter and bicycle rider had a conversation. Officer Austin eventually testified that he did make this assumption.

Martin Flores testified as a defense gang expert. He opined that Melara was not a gang member. Flores testified that he could not determine whether the hypothetical shooter and hypothetical bicycle rider acted for the benefit of the gang because "[i]t's not clear what initiated that conflict. If the conflict was a gang conflict. Whether the conflict was personal. Was it a dispute. Which one started what."

## DISCUSSION

### A. Melara Demonstrates No Error in Admission of the Gang Expert's Answer to a Hypothetical Question

Melara argues the prosecution's gang expert improperly testified as to his knowledge, intent, and guilt. According to Melara, Officer Austin "offered his opinion and conclusions about the knowledge and intent elements of murder and the aiding and abetting theory of liability for murder, and how the issue of guilt should be decided." Melara further contends the testimony not only concerned the ultimate issue in the case, but also lessened

10

the prosecution's burden of proof. Neither the record nor controlling authority supports Melara's argument.

As noted above, Officer Austin testified: "So my opinion, based on those facts, is that he [the hypothetical gang member on a bicycle] knew exactly what was about to happen and it happened. It was carried out. What he wanted was carried out. Now they both [the hypothetical shooter and the hypothetical bicycle rider] are rising in their own personal ranks within the gang." Contrary to Melara's argument, Officer Austin was not asked, and offered no opinion about Melara's knowledge, intent, or guilt. Instead, the evidence Melara challenges involved the prosecutor asking Officer Austin whether a hypothetical gang member would benefit from certain hypothetical conduct. Under controlling case law, the distinction between a hypothetical gang member and the Melara gang member is critical.

*People v. Killebrew* (2002) 103 Cal.App.4th 644 (*Killebrew*) provides some support for Melara's position. In *Killebrew*, the gang expert testified that "when one gang member in a car possesses a gun, every other gang member in the car knows of the gun and will constructively possess the gun." (*Id.* at p. 652.) Although the record in that case was unclear as to whether the expert was responding to a hypothetical question, the appellate court held that the expert testimony was improper because it concerned an "ultimate issue," that is, "the subjective *knowledge and intent* of each occupant in each vehicle." (*Id.* at p. 658.)

In *People v. Vang* (2011) 52 Cal.4th 1038 (*Vang*), our high court recognized *Killebrew* has "limited significance" because *Killebrew* did not distinguish an expert's opinion about the knowledge of hypothetical persons from the knowledge of "specific persons." (*Vang*, at p. 1047.) *Vang* reasoned that experts are

11

permitted to opine on ultimate issues and in doing so, do not usurp the jury's role as fact-finder.  "[E]xpert testimony is permitted even if it embraces the ultimate issue to be decided.  (Evid. Code, § 805.)  The jury still plays a critical role in two respects.  First, it must decide whether to credit the expert's opinion at all.  Second, it must determine whether the facts stated in the hypothetical questions are the actual facts, and the significance of any difference between the actual facts and the facts stated in the questions."  (*Vang*, at pp. 1049-1050.)

Similarly, in *People v. Gonzalez* (2006) 38 Cal.4th 932, our high court concluded there was no error in admitting a gang expert's opinion on whether a gang member would feel intimidated if he testified against a fellow gang member.  Holding that *Killebrew* "*has no relevance here*," *Gonzalez* observed, "[A]nswer[ing] hypothetical questions based on other evidence the prosecution presented . . . is a proper way of presenting expert testimony."  (*Gonzalez*, at p. 946, italics added.)  The *Gonzalez* court further reasoned, "It is true that [the expert's] opinion, if found credible, might, together with other evidence, lead the jury to find the witnesses were being intimidated, which in turn might cause the jury to credit their original statements rather than their later repudiations of those statements.  But this circumstance makes the testimony probative, not inadmissible."  (*Id*. at p. 947.)

*Vang* added:  "To the extent *Killebrew* . . . purported to condemn the use of hypothetical questions, it overlooked the critical difference between an expert's expressing an opinion in response to a hypothetical question and the expert's expressing an opinion about the defendants themselves."  (*Vang, supra*, 52

Cal.4th at p. 1049.)  Melara also fails to recognize this analytic distinction.

As previously noted, Officer Austin did not opine on Melara's knowledge.  Instead, he responded to a hypothetical based on facts in evidence on whether a hypothetical gang member's conduct would have benefited the gang.  Simply put, Melara's argument simply ignores the difference between himself and the hypothetical gang member discussed in Officer Austin's testimony.[4]

## B.  There Was No Error in the Denial of Melara's Motion for New Trial Based on Alleged Jury Misconduct

After trial, Melara moved for a new trial based on alleged jury misconduct.  The trial court denied his motion.  Melara argues the trial court erred in denying his motion for new trial or setting the matter for an evidentiary hearing.  We first provide additional background and then discuss Melara's argument.

### 1.  *Additional Background*

After the verdict, defense counsel moved for a new trial on the ground of juror misconduct.  Melara relied on Juror No. 44's posttrial affidavit in which she stated:

---

[4] The Attorney General argues that Melara forfeited his challenge to admission of officer's testimony based on *Killebrew* by failing to raise that specific objection below.  Melara counters that if we find forfeiture, then defense trial counsel was ineffective in failing to object on the basis that admitting the testimony invaded the province of the jury, as opposed to making merely a speculation objection.  Given our ruling on the merits, we do not address these issues.

● "During the deliberations process, I observed that the jurors made an assumption of guilt based on the fact that there was a gang allegation in the case."

● "Based on how the jurors spoke, I believed that many jurors already had their mind[s] made up as to guilt because of the gang element, even before deliberations began."

● "The jurors used the 'but for' phrase as a standard in determining guilt instead of applying the reasonable doubt standard."

● "One juror . . . used her personal experiences growing up with gangs during deliberations."

● "One juror . . . was a bully and was the worst. He created hostility in the jury room. He discussed his personal experiences with gangs also." The same juror "told the jury to pray together for the defendant and his family."

● "I felt pressured to vote guilty because" of "bullying" by other jurors. "I voted guilty because I just wanted to get out of there."

Relying on Evidence Code section 1150, the trial court found Juror No. 44's affidavit inadmissible and denied Melara's motion for a new trial.[5]

Evidence Code section 1150 provides in pertinent part: "Upon an inquiry as to the validity of a verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced

_____

[5] With one exception, the trial court provided defense counsel the jurors' identifying information. Other than Juror No. 44, no juror spoke to defense counsel's investigator.

14

the verdict improperly.  No evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined."

" 'When a party seeks a new trial based upon jury misconduct, a court must undertake a three-step inquiry.  The court must first determine whether the affidavits supporting the motion are admissible under Evidence Code section 1150, subdivision (a).' [Citation.]  'If the evidence is admissible, the court must then consider whether the facts establish misconduct. [Citation.]  Finally, assuming misconduct, the court must determine whether the misconduct was prejudicial.' " (*People v. Engstrom* (2011) 201 Cal.App.4th 174, 182.)  We independently review the trial court's denial of Melara's new trial motion. (*People v. Ault* (2004) 33 Cal.4th 1250, 1261-1262.)

  2. *Juror No. 44's Affidavit Was Not Admissible*

Our high court has held:  "[E]vidence that the internal thought processes of one or more jurors were biased is not admissible to impeach a verdict.  The jury's impartiality may be challenged by evidence of 'statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly,' but '[n]o evidence is admissible to show the [actual] effect of such statement, conduct, condition, or event upon a juror . . . or concerning the mental processes by which [the verdict] was determined." (*In re Hamilton* (1999) 20 Cal.4th 273, 294, italics omitted.)

"This rule 'serves a number of important policy goals:  It excludes unreliable proof of jurors' thought processes and thereby preserves the stability of verdicts.  It deters the harassment of

15

jurors by losing counsel eager to discover defects in the jurors' attentive and deliberative mental processes. It reduces the risk of postverdict jury tampering. Finally, it assures the privacy of jury deliberations by foreclosing intrusive inquiry into the sanctity of jurors' thought processes.' " (*In re Hamilton*, *supra*, 20 Cal.4th at p. 294, fn. 17.)

Melara admits that Juror No. 44's subjective beliefs were inadmissible under Evidence Code section 1150, but argues that the following three statements fall outside of Evidence Code section 1150's purview: (1) " 'jurors made an assumption of guilt based on the gang allegation' "; (2) " 'based on how the jurors spoke[,] . . . many jurors already had their mind[s] made up' "; and (3) " 'jurors were using a "but for" standard instead of the reasonable doubt standard of guilt.' " (Italics omitted.) Melara's argument is unpersuasive.

First, the statement that jurors assumed Melara was guilty based on the gang allegation falls squarely within the ambit of Evidence Code section 1150. In essence, Juror No. 44 asserted her belief that other jurors subjectively believed that Melara was guilty because the crime allegedly was committed for purposes of Melara's gang. As our sister court has explained: "The subjective quality of one juror's reasoning is not purged by the fact that another juror heard and remembers the verbalization of that reasoning. To hold otherwise would destroy the rule . . . which clearly prohibits the upsetting of a jury verdict by assailing these subjective mental processes. It would also inhibit and restrict the free exchange of ideas during the jury's deliberations." (*People v. Elkins* (1981) 123 Cal.App.3d 632, 638.)

Second, Juror No. 44's statement that many jurors had made up their minds similarly reflects Juror No. 44's view of the

16

other jurors' mental states during the deliberative process.  Juror No. 44's view of other jurors' subjective mental states is inadmissible under Evidence Code section 1150.  "The reality that a juror may hold an opinion at the outset of deliberations is . . . reflective of human nature. . . .  We cannot reasonably expect a juror to enter deliberations as a *tabula rasa*, only allowed to form ideas as conversations continue.  What we can, and do, require is that each juror maintain an open mind, consider all the evidence, and subject any preliminary opinion to rational and collegial scrutiny before coming to a final determination." (*People v. Allen and Johnson* (2011) 53 Cal.4th 60, 75.)

Juror No. 44's claim that the jurors did not follow the court's instruction was also inadmissible under Evidence Code section 1150.  As *Bell v. Bayerische Motoren Werke Aktiengesellschaft* (2010) 181 Cal.App.4th 1108 explained:  Under Evidence Code section 1150, "juror declarations are inadmissible to the extent that they purport to describe the jurors' understanding of the instructions or how they arrived at their verdict." (*Bell*, at p. 1125.)  Further absent "[a]n express agreement not to follow the instructions 'or extensive discussion evidencing an implied agreement to that effect' " a juror's understanding of how other jurors applied the trial court's instructions is inadmissible under Evidence Code section 1150.[6]

---

[6] "It is axiomatic that cases are not authority for propositions that are not considered." (*California Building Industry Assn. v. State Water Resources Control Bd.* (2018) 4 Cal.5th 1032, 1043.)  Ignoring this well rooted principle, Melara relies on several cases that do not consider the application of Evidence Code section 1150 and therefore do not support his argument that Juror No. 44's affidavit was admissible under Evidence Code section 1150.

For example, in *People v. Weatherton* (2014) 59 Cal.4th 589, the defendant argued that a juror's misconduct during the guilt phase of a trial required reversal. Specifically, the juror discussed punishment and judged the case prior to deliberations. (*Id.* at p. 593.) The trial court questioned jurors at a hearing and several jurors agreed that they had discussed the case prior to deliberations. (*Id.* at p. 597.) The high court accepted the defendant's argument that a juror "committed prejudicial misconduct, and reversal is required." (*Id.* at p. 598.) The high court did not apply Evidence Code section 1150 or consider whether evidence was admissible under that section. Neither party raised the issue of Evidence Code section 1150. (*Weatherton*, at p. 595, fn. 5.) Therefore, Melara cannot rely on *Weatherton* to argue that Juror No. 44's affidavit was admissible under Evidence Code section 1150.

For the same reasons *People v. Leonard* (2007) 40 Cal.4th 1370 does not assist Melara. In *Leonard*, the high court concluded that the jury committed misconduct "by violating the trial court's instruction not to discuss Melara's failure to testify." (*Id.* at p. 1425.) The high court considered whether the defendant was prejudiced by the juror misconduct. The high court did not consider whether evidence of misconduct was admissible under Evidence Code section 1150. *Leonard* therefore does not support the conclusion that in this case Juror No. 44's affidavit was admissible under Evidence Code section 1150.

A final example of a case Melara cites that is irrelevant to the Evidence Code section 1150 analysis is *People v. Lomax* (2010) 49 Cal.4th 530. In *Lomax*, our Supreme Court explained that " '[a] sitting juror's actual bias, which would have supported a challenge for cause, renders him "unable to perform his duty" and thus subject to discharge and substitution . . . .' " (*Id.* at p. 589.) For example, a juror's view on capital punishment may disqualify him or her from a jury required to consider the death penalty. (*Ibid.*) The high court held that the trial court's discharge of a juror based on false statements in the jury

(*Bell*, at pp. 1127-1128.)  To recap, Melara identifies no admissible evidence of jury misconduct.  Without showing admissible evidence of misconduct, he cannot show that the court erred in denying his motion for a new trial based on jury misconduct.[7]

## C. Melara's Claim of Ineffective Assistance of Counsel in Not Uncovering Juror No. 18's Purported Concealed Bias Fails Because the Record Demonstrates No Concealed Bias

Melara argues his trial counsel was ineffective for failing to recognize that "Juror No. 18[ ] conceal[ed] . . . his gang experience when specifically asked during voir dire."  (Bold and capitalization omitted.)

A trial court may consider evidence that a juror concealed bias during voir dire as evidence of juror misconduct.  (*In re Hamilton*, *supra*, 20 Cal.4th at p. 294.)  Melara argues his counsel rendered ineffective assistance of counsel by failing to recognize that Juror No. 18 concealed his "personal experience" with gangs "despite being asked."  There is no support for Melara's statement that Juror No. 18 was asked about his

---

questionnaire and refusal to deliberate were supported by the evidence.  (*Id*. at p. 590.)  The high court did not consider the applicability of Evidence Code section 1150.  *Lomax* therefore does not assist Melara.

[7] Melara also states that the trial court should have held an evidentiary hearing.  Given the absence of any admissible evidence, there was no basis for a hearing on jury misconduct.  (*People v. Avila* (2006) 38 Cal.4th 491, 604 [posttrial evidentiary hearing on issue of jury misconduct necessary only if disputed issue of fact].)

personal experience with gangs. The premise of Melara's argument thus lacks foundation.

During voir dire, the trial court asked prospective jurors: "One of the allegations is that this offense was committed for the benefit of a street gang. There may be evidence that people affiliated with the case, whether Mr. Melara, witnesses, decedent in this case, may have affiliation with gangs. Do any of you know any gang members or are associated with any?" Juror No. 18 did not answer the trial court's inquiry.

The trial court also asked: "[A]re any of you victims of any kind of gang-related crime whether theft or violence or anything of that nature?" "Have any of you ever seen any gang activity? You've seen things on the street or at work or somewhere that you thought was indicia of a gang?" "Are any of you familiar with a gang by the name of La Mirada Locos, LML?" "Are any of [you] familiar with the gang Rebels 13?" "Do any of you have any specific training or experience in the subject of street gangs or any psychology or any of the things of those types of subjects or the academic side of that?" "Will all of you be able to evaluate the evidence fairly and not simply disregard things because gang evidence is involved?" "Can you be fair to him? Or are you going to say, 'He's affiliated with a gang and I'm done with him.'" Juror No. 18 did not respond to these inquiries.

Defense counsel also asked prospective jurors about issues related to gangs. Defense counsel asked, "Do you think that if you're in a gang and/or in anyway associated with a gang that you should automatically be guilty because of association?" Defense counsel did not ask additional questions.

Juror No. 18 responded, "Guilty of what, I would say." Defense counsel responded, "Of anything. Of anything that

20

another gang member does."  Juror No. 18 responded, "Not just because of association.  But if you're related to it or you know about it, you could have stopped it."  Defense counsel did not ask any additional questions.

For the first time on appeal, Melara argues Juror No. 18 failed to disclose during voir dire that he had "personal experience" with gangs.  Melara argues his counsel rendered ineffective assistance in failing to discover the purported discrepancy between Juror No. 18 statements during voir dire and Juror No. 44 description of Juror No. 18 as having "personal experiences" with gangs.  In her posttrial affidavit, Juror No. 44 reported that Juror No. 18 "discussed his personal experiences with gangs."  Juror No. 44 provided no further elaboration as to the nature of Juror No. 18's alleged "personal experiences."

The principal problem with Melara's argument is that he identifies no question posed during voir dire that mandated Juror No. 18 to reveal his purported "personal experience" with gangs. Juror No. 44 did not aver that Juror No. 18 knew gang members, was associated with gang members, was the victim of a gang violence, or observed gang activity or other indicia of a gang. Juror No. 44's vague statement that Juror No. 18 had "personal experience" is not directly responsive to any question posed during voir dire.

In sum, the record does not support Melara's argument that Juror No. 18 concealed a bias during voir dire.  His argument that his trial counsel was ineffective is premised on just such a showing.  As the Attorney General argues, "There was no claim to raise, so defense counsel could not be ineffective for failing to raise it."

21

**D.    Melara's Claim that His Trial Counsel Rendered Ineffective Assistance in Failing to Provide a Mitigation Report to the Trial Court Before Sentencing Lacks Merit**

Melara's trial counsel provided a mitigation report attached to a brief for Melara's "youth offender parole hearing." The record does not show exactly when the trial court received the report. On appeal, Melara argues his counsel rendered ineffective assistance in failing to present the report before the trial court exercised its sentencing discretion. For purposes of this appeal, we assume that the trial court did not receive the report before it sentenced Melara. We first provide additional background and then explain why Melara's argument lacks merit.

1.    *Background*

Melara's trial counsel filed a sentencing memorandum. In it she argued he had a minimal criminal record, and had learning disabilities. She noted he was only 22 years old when he committed the crime. Counsel recounted: Melara "was born to a teenage mother, who did not have much [*sic*] resources to raise him." "Mr. Melara's biological father was abusive towards his mother and was an absent parent for most of his life." "Mr. Melara's childhood was unstable as he lived with his mother, his grandmother, and moved frequently."

Defense counsel also filed a brief and an exhibit relevant to Melara's "youth offender parole hearing." The exhibit was entitled "Final Mitigation Report" and was prepared by Jessica Pfeifer, a "Mitigation Specialist." The report details how Melara's grandmother entered the United States from Mexico, his father's abuse of his mother, and his grandmother's

22

undertaking caretaking responsibilities for Melara. Pfeifer observed Melara moved frequently, and he did not complete high school, having left his senior year. She reported no mental health symptoms, but noted Melara sometimes disappeared from his home. Melara reported witnessing violent incidents, including the shooting of one of his cousins. Melara reported that he used alcohol and marijuana. He worked at several part-time jobs.

Pfiefer identified the following mitigating circumstances: (1) "The defendant's mother was a teenager and overwhelmed parent"; (2) "[t]he defendant's father was an absent parent"; (3) "[t]he defendant's childhood was marked by instability"; (4) "[t]he defendant has significant cognitive issues and was identified as learning disabled." (Italics and underlining omitted.) Facts supporting each factor were described in the mitigation report.

At sentencing, the trial court stated, "The court has read and considered the probation report and has also read and considered the sentence memorandum filed by the People on July 11th as well as [the] sentencing memorandum filed by the defense on March 19th." Later, the court indicated it considered a letter on behalf of Melara by Hugo Brent. That letter is not in the appellate record.

At the sentencing hearing, Melara's counsel argued there were mitigating factors. She emphasized Melara's age at the time of the crime, his lack of an extensive criminal history, his courteous conduct, and the fact that his mother was young at the time Melara was born. Counsel argued Melara's mother "was a teenage mother when Mr. Melara was born. She, herself, did not have to raise him. She had to finish her schooling and also work. So he spent time with his mother and grandmother. He

23

witnessed physical abuse from his biological father toward his mother and then his father became an[ ] absent figure for most of his life. His family always struggled financially and they moved around a lot living with either his mother or his grandmother or other family members."

Counsel also pointed out Melara suffered from "learning disabilities." Counsel emphasized that Melara was not the shooter. Based on all of these factors, counsel requested that the court strike the gun enhancement.

Prior to imposing its sentence, the trial court identified factors in mitigation and aggravation. The court noted that Melara had an insignificant criminal history. "With regard to exercise of discretion [in imposing or striking the section 12022.53 enhancement], the court does not feel this would be the appropriate case for striking the gang enhancement given the brazenness and callousness of the offense. As the People indicate, this happened in broad daylight and luckily no other people were injured . . . ." The court denied Melara's request the court strike the firearm enhancement.

After imposing sentence and referring the matter to the probation department, the trial court noted that Melara had submitted a brief and the above-described mitigation report.

2.	*Analysis*

To demonstrate ineffective assistance of counsel, a defendant must demonstrate deficient conduct and prejudice. (*People v. Williams* (1997) 16 Cal.4th 153, 214-215.) In considering a claim of ineffective assistance of counsel, it is not necessary to determine " 'whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies . . . . If it is easier

24

to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.' " (*In re Fields* (1990) 51 Cal.3d 1063, 1079, quoting *Strickland v. Washington* (1984) 466 U.S. 668, 697 [104 S.Ct. 2052, 80 L.Ed.2d 674].)  To demonstrate prejudice, defendant must show a "reasonable probability" that the errors affected the result.  (*Williams*, at p. 215.)  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  (*Ibid*.)

We assume for purposes of appeal that defense counsel failed to timely provide the mitigation report to the court. Melara, however, has failed to demonstrate prejudice from this purported failure.  Defense counsel informed the trial court of the key elements of that report in the sentencing memorandum and during oral argument prior to the court's exercise of its sentencing discretion.  Thus, the trial court exercised its discretion to impose the enhancement with knowledge of the potential mitigation factors.  Although the report contained additional factual details, it is not reasonably probable that the court's review of the entire report would have resulted in a more favorable result to Melara.

### E.    Melara Demonstrates No Error in Assessing Fines and Fees Without an Ability to Pay Hearing

Citing *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*), Melara argues the trial court erred in imposing the $30 court facilities assessment, $40 court operations assessment and $300 restitution fine because the trial court did not hold an ability to pay hearing.  Melara does not challenge the victim restitution, but contends that the amount of restitution should be

25

considered in determining whether Melara has the ability to pay the restitution fine and assessments.

In *Dueñas*, an unemployed, homeless mother with cerebral palsy lost her driver's license when she was unable to pay over $1,000 assessed against her for three juvenile citations. (*Dueñas*, *supra*, 30 Cal.App.5th at pp. 1160-1161.) Thereafter she received multiple convictions related to driving with a suspended license, each accompanied by jail time and additional fees she could not afford to pay. (*Id*. at p. 1161.) The trial court rejected Dueñas's request to hold an ability to pay hearing despite undisputed evidence that she was indigent. (*Id*. at p. 1163.)

The appellate court reversed, holding that due process prohibited imposing the same assessments imposed in the current case and required the trial court to stay execution of the restitution fines until the trial court held an ability to pay hearing. (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1164.) The court expressed concern for "the cascading consequences of imposing fines and assessments that a defendant cannot pay," noting that Dueñas's case " 'doesn't stem from one case for which she's not capable of paying the fines and fees,' but from a series of criminal proceedings driven by, and contributing to, Dueñas's poverty." (*Id*. at pp. 1163-1164.) The court referenced "the counterproductive nature of this system and its tendency to enmesh indigent defendants in a cycle of repeated violations and escalating debt." (*Id*. at p. 1164, fn. 1.)

*Dueñas* is distinguishable because Melara does not face incarceration because of his inability to pay fines and fees. He is incarcerated because he aided and abetted the killing of a rival gang member. (*People v. Caceres* (2019) 39 Cal.App.5th 917, 928 [declining to apply *Dueñas*'s "broad holding" beyond its "unique

26

facts"].)  Also, in contrast to the defendant in *Dueñas* who was unemployed and disabled, the record shows Melara held multiple part-time jobs.  Moreover, following *People v. Hicks* (2019) 40 Cal.App.5th 320, review granted Nov. 26, 2019, S258946, this court has held that *Dueñas* was wrongly decided because it misapplied due process precedents.  (See *People v. Kingston* (2019) 41 Cal.App.5th 272; see also *People v. Kopp* (2019) 38 Cal.App.5th 47, 95-98, review granted Nov. 13, 2019, S257844.)  Even if, arguendo, *Dueñas* were correctly decided, imposition of the minimal assessments here (totaling $370) was harmless given Melara's ability to earn wages during his four-decade prison sentence.  (*People v. Johnson* (2019) 35 Cal.App.5th 134, 139-140 [any error under *Dueñas* harmless when the defendant "will have the ability to earn prison wages over a sustained period"].)

## F.  Remand Is Necessary to Allow for Resentencing in Light of *Tirado*

Melara argues that remand is necessary because the trial court misunderstood the scope of its discretion to impose or strike the section 12022.53 firearm enhancement.  Specifically, Melara contends the trial court had discretion to impose a lesser uncharged enhancement if it was not willing to strike the enhancement altogether.

Effective January 1, 2019, section 12022.53, subdivision (h) provides in pertinent part:  "The court may, in the interest of justice pursuant to [s]ection 1385 and at the time of sentencing, strike or dismiss an enhancement otherwise required to be imposed by this section."  Section 1385 in turn permits a court to strike or dismiss an enhancement in the furtherance of justice.  (*Id.*, subd. (b)(1).)

27

Prior to our issuance of our 2020 opinion in this matter, there existed a split of authority on whether in exercising its discretion to impose or strike a section 12022.53 enhancement, the trial court may instead impose an uncharged enhancement. (See *Tirado*, *supra*, 12 Cal.5th at pp. 696-697 [describing split among the Courts of Appeal].)

In considering the issue in this case, we concluded the trial court did not have the authority to apply an uncharged lesser enhancement. As stated in the preface to this opinion, Melara's petition for review was granted on the issue, and the Supreme Court remanded this case to us for reconsideration in light of its opinion in *Tirado*, *supra*, 12 Cal.5th 688, where the court clarified that the sentencing court does have the authority to apply an uncharged lesser enhancement. (*Id*. at p. 700.) In as much as it is not clear whether the trial court would have exercised its discretion differently on the firearm enhancement, the Attorney General and we agree this case must be remanded for resentencing pursuant to the Supreme Court's direction.

G. **Remand Is Necessary to Determine If Melara Is Entitled to the Benefits of Senate Bill No. 567**

During the pendency of Melara's appeal with the Supreme Court, the Governor signed three bills that amended section 1170: Assembly Bill 124 (Stats. 2021, ch. 695, § 5), Assembly Bill No. 1540 (2021-2022 Reg. Sess.) (Stats. 2021, ch. 719, § 2), and Senate Bill No. 567 (2021-2022 Reg. Sess.) (Stats. 2021, ch. 731, § 1.3). Senate Bill No. 567 incorporated Assembly Bill 124's and Assembly Bill No. 1540's amendments to that section. (See Stats. 2021, ch. 731, § 3(c).)

Relevant here, amended section 1170, subdivision (b)(6), now provides, "Notwithstanding paragraph (1) [directing that the

court impose a sentence not to exceed the middle term of a sentencing triad except as provided in subdivision (b)(2)], and unless the court finds that the aggravating circumstances outweigh the mitigating circumstances that imposition of the lower term would be contrary to the interests of justice, the court shall order imposition of the lower term if any of the following was a contributing factor in the commission of the offense:  [¶]  (A) The person has experienced psychological, physical, or childhood trauma, including, but not limited to, abuse, neglect, exploitation, or sexual violence.  [¶]  (B) The person is a youth, or was a youth as defined under subdivision (b) of [s]ection 1016.7[8] at the time of the commission of the offense.  [¶]  (C) Prior to the instant offense, or at the time of the commission of the offense, the person is or was a victim of intimate partner violence or human trafficking.”

The Attorney General agrees that section 1170, subdivision (b)(6) is ameliorative and retroactive under the principle articulated in *In re Estrada* (1965) 63 Cal.2d 740, that absent evidence to the contrary, the Legislature intended amendments to statutes that reduce the punishment for a particular crime to apply to all defendants whose judgments are not yet final on the amendments’ operative date.  Thus, the Attorney General observes Melara may raise his arguments that he is entitled to the benefits of section 1170, subdivision (b)(6) upon remand of this case.

---

**8** Assembly Bill 124 added section 1016.7, subdivision (b), which provides that for purposes of the section, a “ ‘youth’ ” “includes any person under 26 years of age on the date the offense was committed.”  (Stats 2021, ch. 695, § 4.)

We agree. Upon remand, a trial court may revisit all of its prior sentencing decisions under new legislation. (*People v. Valenzuela* (2019) 7 Cal.5th 415, 424-425 ["the full resentencing rule allows a [trial] court to revisit all prior sentencing decisions when resentencing a defendant"]; accord, *People v. Buycks* (2018) 5 Cal.5th 857, 893 ["the 'full resentencing rule' "].) Here, because we remand the matter so that the trial court may reconsider Melara's sentence for the firearm enhancement under section 12022.53, Melara will have the opportunity to raise his arguments relating to section 1170, subdivision (b)(6) to the trial court at that time.

**H.    Assembly Bill 333—Remand Is Necessary to Permit Retrial of the Gang Enhancement Allegation Under Section 186.22, but Not for Retrial of Melara's Second Degree Murder Conviction Under Amended Section 1109**

Melara also argues that in light of amendments made pursuant to Assembly Bill 333, we must remand his case for retrial of the murder charge and gang enhancement allegation and resentencing. In 2021, the Legislature passed Assembly Bill 333, amending sections 186.22 and 1109, effective January 1, 2022. (*Tran, supra*, 13 Cal.5th at pp. 1207-1208.) We consider Melara's arguments concerning each amended statute below.

1.    *Remand for Retrial of the Gang Enhancement Is Necessary Under Section 186.22*

Assembly Bill 333 amended section 186.22 to require proof of additional elements to establish a gang enhancement. (*People v. Lopez* (2021) 73 Cal.App.5th 327, 343.) For example, amended section 186.22, subdivision (e)(1) now requires proof that the predicate offenses used to establish a pattern of gang activity

"commonly benefited a criminal street gang, and the common benefit of the offense is more than reputational." Subdivision (e)(2) prohibits using current charged offenses to prove the pattern of criminal gang activity; subdivision (f) redefines " 'criminal street gang' " to require proof that members of the gang collectively, as opposed to individually engage in or have engaged in a pattern of criminal gang activity; and further defines " 'pattern of gang activity' " in subdivision (g) as meaning "to provide a common benefit to members of a gang where the common benefit is more than reputational." (Stats. 2021, ch. 699, § 3, eff. Jan. 1, 2022; *Lopez*, at p. 345.)**9**

The Attorney General agrees the changes made to section 186.22 apply retroactively to Melara under *In re Estrada, supra*, 63 Cal.2d 740. (See *People v. Delgado* (2022) 74 Cal.App.5th 1067, 1087 [Assem. Bill 333's amendments to § 186.22 apply retroactively to non-final judgments]; *People v. Lopez, supra*, 73 Cal.App.5th at pp. 343-344 [same].) We agree as well. Thus, the gang enhancement and the sentence on the gang-firearm enhancement must be reversed, and we remand the matter to allow for a retrial of the gang enhancement consistent with section 186.22. On remand, Melara may raise arguments concerning intervening authority, including *People v. Valencia, supra*, 11 Cal.5th 818.

---

**9** Further, effective January 1, 2023, section 186.22, subdivision (b)(3) will require the court to impose "the middle term of the sentence enhancement, unless there are circumstances in aggravation or mitigation. The court shall state the reasons for its choice of sentencing enhancements on the record at the time of the sentencing." (Stats. 2021, ch. 699, § 4, eff. Jan. 1, 2022, operative Jan. 1, 2023.)

2. *Remand and Retrial of Melara's Second Degree Murder Conviction Under Section 1109 Is Not Necessary Because Any Failure to Bifurcate Is Harmless*

Melara contends newly enacted section 1109, which requires the trial court to bifurcate the adjudication of the underlying offense and the gang enhancement upon a defendant's request, requires this court to vacate his second degree murder conviction and remand the matter for retrial. The Attorney General disagrees, arguing that section 1109 is not retroactive.

There is currently a split of authority among the Courts of Appeal on the question whether section 1109 applies retroactively. (Compare *People v. Burgos* (2022) 77 Cal.App.5th 550, 566-567, review granted July 13, 2022, S274743, and *People v. Ramos* (2022) 77 Cal.App.5th 1116, 1131 with *People v. Perez* (2022) 78 Cal.App.5th 192, 207, review granted Aug. 17, 2022, S275090, and *People v. Ramirez* (2022) 79 Cal.App.5th 48, 65, review granted Oct. 12, 2022, S275341.)

Our Supreme Court identified this split in its recent opinion, *Tran*, *supra*, 13 Cal.5th at p. 1208, but declined to opine as to whether section 1109 is retroactive. The court chose instead to find any error harmless on the facts before it. (*Tran*, at p. 1208.)

Like the defendant in *Tran*, Melara argues the Attorney General must, but cannot, demonstrate that the failure to bifurcate the trial was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24 [87 S.Ct. 824, 17 L.Ed.2d 705].) The *Tran* court rejected the defendant's argument that *Chapman* applied, finding the prosecutor's use of gang evidence did not render the trial "fundamentally unfair," and

32

applied the standard of prejudice articulated in *People v. Watson* (1956) 46 Cal.2d 818. (*Tran*, *supra*, 13 Cal.5th at p. 1209.) We reach the same conclusion here.

As in *Tran*, Melara does not explain how the exclusion of gang evidence in this case would have been reasonably likely to change the jury's verdict of guilt as to the underlying murder. Here, the case for guilt was very strong, even absent the gang evidence. The murder was captured on video. The video showed every step of the events leading to the crime, including showing Melara on the phone (which was corroborated by cell phone records), the arrival of a black car that Melara then approached, Melara twice pointing at Hernandez, the black car then pulling up to Hernandez, and the driver shooting Hernandez. Cell phone records also suggested that Melara entered Luna's car shortly after the shooting and traveled together to Oceanside, California. Thus, we find that even if bifurcation is retroactive and applies in Melara's case, the error was harmless under *People v. Watson*, *supra*, 46 Cal.2d 818.

In summary, we conclude this case must be remanded under section 186.22 for retrial of Melara's gang enhancement allegation and for reconsideration of the gang-firearm enhancement; under section 12022.53 as articulated in *Tirado*, to allow the court to consider whether to sentence Melara pursuant to a lesser included firearm enhancement; and under section 1170, subdivision (b)(6), for the trial court to determine whether Melara is entitled to receive a lower term for the gang enhancement.

## DISPOSITION

The matter is remanded for retrial of the gang enhancement allegation under the amendments to section 186.22,

during which time Melara may raise evidentiary challenges pursuant to *People v. Valencia, supra*, 11 Cal.5th 818.

The matter is also remanded for resentencing as follows: If the gang enhancement allegation is not found to be true, the trial court shall strike the gang-firearm enhancement sentence. If the gang enhancement allegation is found true, the trial court shall consider (1) whether, pursuant to section 12022.53, subdivision (h) and *Tirado, supra*, 12 Cal.5th 688, to impose a term for a lesser included uncharged gang-firearm enhancement articulated in section 12022.53; and (2) whether, pursuant to section 1170, subdivision (b)(6), to impose the lower term for the gang-firearm enhancement articulated in section 12022.53.

We otherwise affirm the judgment.

NOT TO BE PUBLISHED

BENKE, J.[*]

We concur:

ROTHSCHILD, P. J.

BENDIX, J.

---

[*] Retired Associate Justice of the Court of Appeal, Fourth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.